The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Robert J. Steigman presiding. Thank you, Mr. Bailiff. The second case this afternoon is Peeble v. W. F. Robert Dailing, if that's pronounced correctly, 425-0717. And as Counsel to the Appellant, please state your name. Yes, Your Honor, my name is Chris Evers, Counsel to the Appellant from the State Appellant Defender's Office. And Counsel for Appellee? Jenna Seaver, Counsel for the Appellee for the People. Pronounced Seaver? Seaver, yes. Seaver, okay. Mr. Evers, on behalf of the Defendant, you may proceed. Thank you very much, Your Honor. May it please the Court, and good afternoon, Your Honors. As I said, I'm from the Office of the State Appellant Defender. We raised three issues in this case, and in the limited time that I have on my argument here and in a few minutes on rebuttal, I'd like to focus first on the sufficiency issues related to force and the intertwined issue of Detective Cowick's expert-like testimony that went to the supposed bruising and force, and then as time remains, deal with the consent issue and sentencing. Of course, if the Court has any questions or something you'd like me to focus on, please let me know, and I'll direct my attention immediately to that. But moving to the first issue of the lack of sufficient evidence for the element of force or threat of force, at trial, the State put forward as their theory three aspects of force that they wanted the jury to consider. The first was the hand around the throat, supposedly, of B.B. that they applied generically to both counts. They mentioned the second act of force was the placing of Mr. Dailing's penis on B.B.'s mouth two or three times, which that force went to count two, the oral penetration. And then the third aspect of force they brought up, which isn't really vital here, is that she tried to keep her legs closed and he forced her legs open, which they talked about for the vaginal penetration on count one. The reality is that us as attorneys in U.N. Justice are dealing with legal concept of force, penetration, consent, that have in context a very real emotional reaction for the real people who are affected by it. Can I get you to slow down just a little bit? It sounded like you said that the force that they're talking about is the actual force of penetration, and that's not the case, is it? Well, I agree, Your Honor, and that's one of the mistakes the State made at trial, and I apologize for my speed. I'll take a breath and I'll move a little slow. But yes, Your Honor, at trial, they argued that the penetrative acts of the penis touching the mouse was the force that would meet the force element. They've argued that in their briefing before this court as well, too. And yes, Illinois law has been clear that the lowercase force of the penetrative act itself goes to the act in the element of penetration, but that does not meet the separate force or federal force element. There has to be something else. Did the charge specify the nature of the force? I'm sorry, I missed the first part of your question. Did the charge specify the nature of the force? No, Your Honor, the indictment just said the statutory language of force or the threat of force. There was not a statement of what force was used. At trial, therefore, really, if we're not talking about the specific penetrative acts that the state argued, the only other force they argued was the hand around the throat of Bebe that she testified to. And as our briefing explained, that was insufficient because the only evidence of force was Bebe's testimony herself. And she did not testify that she was threatened verbally by Mr. Dailing to submit to the penetrative act. And there was no evidence that he used any kind of force. So there's her testimony, there's the admitted testimony of both the nurse and the doctor, and there's the testimony of what the officer observed, correct? That hand was placed around her throat. Absolutely correct, Your Honor. That's correct. But the force in Illinois law is- You told the nurse she was choked. Well, she said that she was choked, certainly, and there's evidence of that that the state put forward. Absolutely, Your Honor, for that. But for the force element, it's not enough that force took place, that bodily harm took place. That would be an element of battery, just physical conduct and harm. But there has to be- He said he grabbed her around the neck and forced her head down. She did not want to do it. And he kept trying to force her face onto his penis repeatedly. No, Your Honor. Didn't she say something to that effect? No, Your Honor. That is actually not her testimony. I'm not trying to fight with you, Your Honor, but I guess that's getting to the nature of the case. I was just kind of generalizing, but go ahead. Mr. Jernig, Bibi's testimony was inconsistent throughout the entire trial, for her direct, her cross-examination, the redirection, recross, but the testimony coalesced around this sequence of the events, all four of the individuals, Bibi, Dailing. We're just talking about the force element. Exactly. Because that's the element you're saying is missing. Right.  She testified that- Did she say he grabbed her around the throat, the neck, the throat? Yes, for approximately two minutes, Your Honor. Did she say that he forced her head down to his penis? No, she did not, Your Honor. That was not her testimony. Okay. What did she say in that regard? She testified that after the two minutes of around her neck, she then started to talk to Jacqueline, who was her friend in the room. She then said that Dailing asked Jacqueline and Carter to leave the room. At that point, they left the room. Then she testified that at one point, he removed his pants and his underwear, and then tried and asked for oral sex, using more crude language than that, but he asked for oral sex, and placed his penis on her mouth. No- What? Didn't she say- She described exactly how he did it. He grabbed her around the throat and tried-  That stopped? She spoke to Jacqueline? Well, that's one version. That's one version you're relying on. Now, in fact, the witness's testimonies were more consistent with her testimony at trial, weren't they? I understand you want to put the gap of two minutes in there, and that's not my question. My question is, was there an act of grabbing her around the neck? Was there an act of forcing her head down and trying to make her do this several times that she said no, that she pushed back against him on at least one occasion, and finally she just let it- I think her words were, let it happen. No, Your Honor. That is not the narrative that she admitted to that, and that's not what- No, no. Please, go right ahead, because we've all got the transcripts. We've all got the testimony. Go ahead. Okay, so she said different things at different points in the trial, and that's why this is complex, and why we're raising this on the appellate review process to go through this and understand that the element of force, in federal force, is more than just the emotion of what she might have said first on direct testimony. But, no, there's the break. She said that she didn't talk to the officer about Jack- I'm sorry. Did you just say it's more than what she testified to? It's more than what she testified to on direct examination, Your Honor.  Because on cross, then what came out is that she told the officer, and then she said, agreed, this is what happened. She was grabbed by the neck. No verbal exchange about that, what the purpose of that was, is in the transcripts of the testimony. Then spoke to Jaclyn, so that force, absolutely not grabbing by the neck, is a physical action. That's a force. But it's not a matter of force happening. It's a matter of force being to overcome the will, which Illinois law requires, for the act of sexual penetration. And there's a break in that. The word we use in the reply is there's no nexus. It's decoupled from that. And she said in her testimony, cross examination, and reiterated that later on, redirect and recross, that's the sequence what happened. And that's our argument here, is that the force in federal force element wasn't met, because there isn't any verbal threat made by Dailing that's in the testimony. And her own testimony decouples whatever the grabbing of this neck is. Now, the state has certainly argued in the closing, and certainly in their briefing now, is that that grabbing of the throat was force required to meet the force element of both counts, the vaginal penetration and the oral penetration. Our position basically is that no, that's not enough, because there's a break there. It's not connected to her ultimately, as she said, let it happen because he was touching her mouth, her lips with his penis and asking for oral sex. But that itself also wasn't a threat. It was just asking. She said no verbal, a verbal response to that, and that's the position we're taking here. As part of that, the testimony of the officer, Detective Kolek, which is transitioning to that second issue, not trying to get away from force, but that this is a good transition unless there's additional questions from either yourself, your Honor, or your colleagues about that. Okay. With your permission, I'm going to transfer to our second issue about the testimony. The question on all this, it seems to me that your basic point is, even if the alleged victim here testified in support of a claim of force on direct examination, her testimony on cross-examination undermined that. Is that essentially what you're saying? Yeah, not only her testimony, but then the video, which was entered as substantive evidence that she told the officer the same day it happened, that after this grabbing by the neck, I then spoke to Jacqueline. And then she clarified she spoke to Jacqueline, and then Dailing asked Jacqueline and Carter to leave the room. So it's not just her testimony on cross. It's the substantive evidence of her statement to the detective, literally within less than 12 hours after the incidents that make up this case. So it seems to me at best we have inconsistent statements from the victim, BLB, in this case, one of which testified as direct would support the conviction, and the others would be inconsistent with that. Is that what you're saying? Well, yes, she's inconsistent on cross. She adopted the inconsistency she said on cross on her redirect. So here's my question. I understand your position. Here's my question. We have a jury that heard all of this, saw her testify, heard the alleged inconsistencies, and returned a guilty verdict. Why isn't a jury entitled to believe what she said in open court as being sufficient and the other matters as not sufficiently undermining them to cause the jury not to believe it? Because we've used the word inconsistent. Her talking to Jacqueline is in between what she said in direct. It's less that she's contradicting herself. I understand your argument. What I want to know is why can't we respect the jury's decision to believe her direct examination, which I think you just conceded if believed would be enough to convict. Because the state then presented two forms of evidence. On direct and then redirect, they had Jacqueline testify to the first part saying that there was more, there was a pull down and then a penis touch. On redirect, the state got her to say, yes, I had my neck pulled, then I spoke to Jacqueline, then dealing as Jacqueline Carter. So the state's evidence goes to both. And her statement to the detective was made within 10, 12 hours after. And that is what the defense put forward. How could a jury have accepted a testimony on direct examination, which would have been sufficient to convict? If the jury accepted exclusively what she said on direct, they could have said or found that that physical pulling, yes, went to that. And if we're going to just say that if the jury heard this and decided not to listen to B.B. and cross-examination, not to listen to B.B. and the redirect examination by the state, then that would be sufficient, Your Honor. But that's what appellate review is for is because her statement and her story of what took place coalesced consistently, starting with the cross-examination, the video, and the state's then adoption of that narrative as well. Why shouldn't we accept the jury's verdict, counsel? Why shouldn't we accept the jury's verdict? They might have concluded that B.L.B., not being some Rhodes Scholar, was upset or bothered or not totally clear on some of these points on either cross-examination or she told the police. But sitting there in front of God and everybody and the jury on the direct examination, she testified to this crime being committed. Why wouldn't that be? And why shouldn't we respect jury's determination of that? Because one of the purposes – yes, sufficiency is the greatest standard of review for a criminal defendant. But what the testimony is across the entire board – yes, Your Honor, you're right. If you accept only the direct examination, I can't get you to reverse on the sufficiency of the force. That's true. But we don't only have the direct examination. We have the entire trial, and B.B. then stated, yes, this is what happened after watching the video. Again, excuse me, counsel, but why the jury heard all of this and notwithstanding all of the inconsistencies, still came to that conclusion. So again, how would you answer Justice Steigman's question? Why in this instance should we overlook or overturn the jury's decision after the jury heard all of this, all the inconsistencies? Because, Your Honor, our position is – and, of course, that's the privilege of your power. Obviously, you can do that. But the evidence is not just the direct. It's not that the jury heard it, and therefore we cannot overturn that. They heard everything. All the evidence was there, and the state's own evidence adopts the narrative that began in the cross-examination about the sequence of events of the hand around the neck was broken from any attempt to get oral sex. That is the evidence. The jury heard all that, and they decided not to. Counsel, that's how you're portraying it. In reality, isn't it simply that Jacqueline and the boyfriend testified that they weren't present to see the hand around the neck? Isn't that actually what the testimony was? They said they didn't see it. I'm going to disagree with that too. Well, they didn't see it. You're right, Your Honor. But them not being present and not seeing it…  Wait a second. They said they weren't there when that happened. Well, they said they did not see any hand around the neck. Right. And so what you're calling the inconsistency is because she at one point had said she thought she might have spoken to Jacqueline at one point, then, therefore, there must have been this gap of time because they didn't see that happen when they were actually in the room. Isn't that really how – what you're calling the inconsistency? That's really how it plays out in the testimony. Your Honor, I'm not saying there's much of an inconsistency at all. The sequence of events, if you put all the testimony together, all of what Bibi says happened. Bibi has said happened in her testimony, in direct, mixed together with her cross-examination that she adopted, along with her redirect and recross, that she had a hand around her throat. That stopped. She spoke to Jacqueline. That's the gap in time, Your Honor, that we're focusing on. So before your time runs out, we want to talk about the other issue and give you an opportunity to address it regarding Detective Cowick's testimony that you raised on appeal. Am I correct? You described that as expert-style testimony? Yes. What does that mean? Is he testifying as an expert or is he not? Our position is that he got to testify an expert, even though everyone agreed he was not an expert. He used his training and experience from his supposedly medical training from police, his combat lifesaver explaining, and used specialized knowledge, which is what Rule 701 and 702 are. What was his specialized knowledge that he used? He said his medical training from his police time, his experience as an officer, and his combat lifesaver thing. That's the only specialized training he talked about, but he brought it up and he said to the jury, ultimately, these photos, Exhibits 8 and 9, these minuscule red dots, you see them? No, wait a minute. He never made any reference to his training when he was talking about the photographs. Before he talked about the photographs, he explained why he… Well, quite a ways before, because by the time he's talking about the photographs, he's gone through a substantial amount of testimony. Let's go back to the one point in time when he actually referenced his training, R-456. Throughout my years of investigation, as well as you know, the medical training I've had here, as well as being a combat lifesaver on the military side of things, I know that injuries such as bruising doesn't always appear right away. Sometimes it takes some time for it to show itself. What about that is beyond the average knowledge of a juror? That's not the point that we're saying. No, no, wait a minute. No, that is the point. You can't mix them. This is what he attached his training to. There is no other reference by him to his training, I would suggest to you, other than at this point in his testimony. And all he said was, I know that such bruising doesn't always appear right away. Is that something beyond the knowledge of an average juror? That he can detect… Yes or no? No. Yes or no? I know that injuries such as bruising… So, counsel, in other words, we parents don't understand that an injury to a child might not have a bruise now, but three hours later, it might show up? To detect that the bruise is from fingerprints? That's a different issue, counsel. That's precisely the issue that we raised about. Counsel, the question about bruises coming in later, showing up later, that's the question. Isn't that common knowledge? Don't parents, all parents know about that? Isn't that something that people commonly understand? People understand that, yes. Okay. Well, then what makes him an expert to say that? It's the coupling of him saying, because I have specialized knowledge, mentioned the bruises, I know these are fingertips. No, no, that is not accurate. That I find in your brief, which I also find disingenuous, but that's also not an accurate representation of what the testimony was. There was never an indication by him that he was making this determination based upon his expertise. And that is a misrepresentation. Thank you, counsel, but we asked you a lot of questions, and I don't want to shorten your response here. So go ahead and answer Justice DeArmond's question, and we might have some more as well. Okay, thank you, Your Honor. Your Honor, I disrespectfully disagree. Our position is that he linked, when he gave his expertise, there was four minutes of a sidebar, and then he said about my understanding that those were fingertips. Those were brought about that. And so that is connected, that I know that you jurors can see this photo, I can see this photo, but I know better than you, because of my training, that those were caused by fingertips, and that boosted Bibi's testimony. You're saying that he included that in his testimony? He mentioned the fingertips. He determined they were fingertips. No, no, no, no. His expertise. I know that these are fingerprints. He did not say that. He did not say that. We disagree, Your Honor. Yeah, look at page R461, 460, 459. We disagree, and so does the transcript. So, counsel, in other words, if I'm a parent and the kid's been involved in a fight, and I look at this child, and it looks like there are bruises on the child's neck, I have to be an expert witness to say that looks like it's fingerprints, where finger pressure was causing the bruising? If they looked like fingerprints. What we're talking about here is these red dots that Bibi herself thought were things. Well, the red dots created by fingertips choking. That's not something that this terminology, you can look at this series of, what was it, three or four of the red dots in a row on the victim's neck? Wasn't that true? There were some red dots in her neck and that kind of, and what the officer testified to, Detective Kowlick testified to, was that we also, myself, the jury, but I can tell you that these are from fingers. That is not the testimony. Well, you'll have an opportunity to address this against rebuttal, and at this time then, receiver, on behalf of the appellee, you may proceed with your argument. Thank you, Your Honor. May it please the court, counsel, Jenna Seaver, on behalf of the people. Viewing this evidence in the light most favorable to the people, defendant was proven guilty of criminal sexual assault beyond a reasonable doubt. Defendant absolutely used force against Bibi to commit the sexual assault. First, he did place his hand around Bibi's neck and pulled her over to him, hard enough to have left bruises and marks on her neck. And then she did testify that she told him to stop when he did this and that she did put her hands up to try to get him to stop, but he wouldn't. Any reasonable person would be afraid in her shoes like she testified that she was. And then right before he placed his penis in her mouth, he testified, and just to clarify this testimony about the defendant placing his penis against the mouth, she testified that he did it several times. So he pushed his penis against her mouth. She told him no. He pushed his penis against her mouth. She told him no. He pushed his penis against her mouth. She told him no. And then finally, on the fourth time he pushed his penis in her mouth, she said, you know, I just let it happen because he wouldn't stop. If that's not an example of force, I don't know what is. Well, counsel, I'm going to ask good afternoon. How do you respond to counsel's position? Gap this time gap between the time when the defendant placed his hands around her neck and the sexual acts and activity commenced is significant in terms of whether or not there was force. He contends there was not and that there was this break. And so how do you respond to that? And why does that not have any credibility? Your Honor. So the assaults have started when this first use of force happened, which is when she was pulled by the neck. And regardless of whether she talked to Jacqueline in between there or not, she still is afraid of the force that he's already exerted over her. And then he continues to use force against her by placing his penis against her mouth. I mean, at this point, he's already pulled her by the neck. Of course, she's afraid. Of course, she's willing to submit to that force of placing his penis against her mouth. Isn't that part of the act? I mean, force is not that's not how force is legally defined. Right. In a sexual context or a legally sexual context. Your Honor, this goes him placing his penis against her mouth is not the force exert or used to commit the sexual assault, especially since he does it multiple times. So he's forcing his penis against her mouth. She's saying no. It's forcing his penis against her mouth. She's saying no. It's forcing it against her mouth. She's saying no. And then on the fourth time, then that force is used to push inside her mouth. So it's not just just to be just to be clear. To set this up there, according to her testimony, they're sitting next to each other on the couch, correct? Yes, I believe she testified that he's, I think, kneeling in front of her on the couch. And she's he's she's been grabbed by the neck at least once. Right. Yes, Your Honor. And then she talks about how he kept. Trying to put his penis in her mouth multiple times. Yes, Your Honor. She pushed she tried to push him away. And and showed using her hands. Yes, several times and then verbally told him no several times. And he continued to force himself on her until she finally just said, I let it happen. Yes, which was reasonable under the circumstances, considering the for all the force he used to make the sexual assault happen. OK, go ahead. I'm sorry. OK, so. Those are all the reasons are all the shows of showing the force that defendant used against BB to get her to submit to the oral penetration. And because he used this force, we, of course, know that there was no consent. But we also know that there was no consent in this case because she testified many times that she said no. She tried to push him away. She ran out of the house after this occurred with only one shoe on. And, you know, didn't even go back for it. She immediately outcries to multiple people, including her grandma. And the first thing she says is something happened that I didn't want to happen. She undergoes the same exam and defendant even mentioned to his friend Carter that. Mentioned to Carter that he tried to get BB to perform oral sex and that she, quote, didn't like sucking dick. So we know that defendant use force against BB to commit this sexual assault. And we know that the force or the sexual assault or excuse me, the penetration was not consensual. And for those reasons, the people proved defendant guilty of sexual criminal sexual assault. And to segue into officer or sorry, Detective Cowick's testimony, he was a lay witness that gave lay witness testimony. It's it's not a medical opinion to observe a bruise. Your honors touched on this. I mean, basically, everybody knows what a bruise looks like and could say. He had firsthand knowledge of BB's injuries. He met her two times after this assault happened. I believe his first time was the day after. And then the day after that, he took two sets of photos to document the bruises and marks on her neck. He said he testified. Yes, I saw her. I observed her neck. She told me that she was pulled by the neck or that she was choked by the neck. And I observed bruising that could be consistent with that. I observed marks on marks on her neck that looked like fingerprint marks. Again, anybody could know what a fingerprint mark would look like. So this was not specialized testimony that required him to be an expert. And he did not qualify himself as an expert to say, oh, in my experiences, I've observed that injuries can get more pronounced as the days go on. And that was consistent with the photos he took where he said, I, you know, I generally take photos, follow up photos for victims just because it can be a little bit more pronounced as time goes on, which was the case here. Regardless, BB testified to the marks and bruises on her neck as well. We also have testimony from the nurse and doctor saying that, you know, injuries can show up later on as well. So, but ultimately, it's the people's position that this detective was a lay witness testimony, giving permissible lay witness testimony. Now, counsel, this testimony that was being offered wasn't a surprise to the defense, was it? This was all subject to a motion and limine that had been argued out prior to trial. Correct? Correct. Your honor. And during the direct examination, there was no objection to the question by the state. She'd indicated during that morning incident that she'd been showed by the defendant. Did you see any injuries on her neck? Yes, ma'am. There's no objection to that. Was there? I don't believe so. He goes on when when the officer does testify about his combat life saving or military experience. What he says is that I know that such and such injuries strike that I know that injuries such as bruising doesn't always appear right away. Sometimes it takes some time for it to show itself. Correct? Correct. There was also no objection to that either. Was there? No, your honor. All right. He then proceeds on to a series of questions explaining how he does take follow up photographs of injuries over multiple days because he is aware of that fact. And he's asked, and is it is that because the injuries may not show up until later and may become more pronounced as time goes on? Answer exactly. Again, no objection to that question either. Correct? Correct. Next question. Tell us what injuries you observed on Miss Butler objections foundation. And that was then the basis for the chambers sidebar during that chamber sidebar. Trial counsel argues that the foundation just laid does not show that he has any experience with strangulation. Did officer Howard ever talk about strangulation? No, your honor. Was he ever asked about strangulation? No, your honor. Well, other than defense counsel on redirect, but we're going to get to that in just a sec. So they go through the sidebar. Ruling is. That there is adequate foundation to have testimony and questions asked of him based on his observations, or if this was consistent with either strangulation or finger marks. But that question was never asked, was it on direct examination? No, your honor. Neither strangulation nor finger marks. And yet this is what the court said. Was going to be admitted if the state chose to use it. So, then they go back on the record. So, I noticed on the left side of her neck, there appeared to be some bruising. When she had she also when she had told you. That she'd been choked and she demonstrated that to you. Again, no objection. Yes, she did. And where you saw that bruising, was that consistent with where she had indicated based on telling you where she had been choked, where she said she was choked? Answer? Yes, ma'am. Again, no objection. He talks about going in on the seven. I observed those same marks I had seen the day before. The day prior, but they were a little bit more defined and the bruising was a little bit more darker than they were the day before. When asked to explain what appeared as if on her left side of her neck, there were three indications that I could see on the left side. And they were consistent with what I appeared to be, what I believe to be fingerprints or fingers, the tips of fingers. Again, no objection to that question, correct? Correct. And where you saw those finger marks, is that consistent with where she told you the person who had sexually assaulted her and put his fingers on her neck? Yes, ma'am. Again, no objection. So, is it fair to say you can see bruising in the pictures, but it was actually more pronounced in person? Yes. And he explained that, yeah, the pictures didn't really show up well, but I could see them better when I saw them myself. Interestingly, after he is then shown the photographs and we get to re-cross, trial counsel's first question, is it your sworn testimony that the pictures that you just showed, that we just saw, that you think that those injuries are consistent with a person who's been choked for two minutes? No. I mean, I wouldn't be able to tell that from the pictures, sir. But I believe the pictures show that there are bruising consistent with fingerprints. Question, defense counsel's question, of a person who'd been choked for two minutes? Answer. Again, based off of the bruising, I can't tell how long that happened. I can tell you that it appeared that those bruises were done by fingerprints. So the objections that we keep hearing about the references to fingerprints were the questions asked on re-cross examination by defense counsel. Is that not correct? You're correct, Your Honor. That was honestly all I had. If there are no other questions, we ask that this court affirms defendant's conviction and sentence. Thank you, counsel. Do I have anything to add from the defendant? Do you have anything to double, sir? Briefly, Your Honor, yes.  So defense counsel filed a motion in the lemonade that was granted due dissent that no expert testimony could be given. He raised a sidebar after and had another argument before Detective Kallik testified. And then when he talked about his, for the first time ever, the combat lifesaver, he had another sidebar and they talked about his testimony. That defense counsel did not object to every single thing that Detective Kallik talked about and his opinion or his specialized experience doesn't actually waive the issue or say that he agrees with it. It would be essentially. Why not? Why isn't he required to object when the testimony comes in or he forfeits his objection? Because he's raised the objection. He's been denied by the trial court and to have him to object. No, wasn't that the motion in the lemonade or where was it denied by the trial court? In the sidebar and the discussion before Detective Kallik. Well, what was the ruling by the court in the sidebar? How did that work? Okay, so what we're arguing here is the circuit court aired when it allowed Detective Kallik to talk about his special training and his experience to give whether though he was a lay opinion witness. He gave evidence based on specialized knowledge. These red marks because of my specialized knowledge on specialized knowledge. I'm sorry. What what evidence did he give based on specialized knowledge? I know that these are fingerprints because of my specialized combat combat. Let's say that he said that he's talking. They were consistent with what I appeared to be what I believe to be fingerprints or fingers the tips of fingers. That's a completely different question than the objection that was raised or the basis for the objection because the basis during the sidebar was that there's no foundation that to show that he has any experience with strangulation. He never testified to strangulation. So when he's now testifying about what appears in his opinion to be fingers bruises based on your fingers or just all he says is appears to be what I believe to be fingerprints or fingers the tips of fingers. There's no objection. That's a completely different objection not covered by the one for which the sidebar existed. I would suggest. And our position is your honor him telling the jury. You have the photos. I have the photos. I know better than you because even though these small red marks look like small red marks. They're actually fingers because the bruising wasn't showing fingers. I want to go back to my question Council. My question was dealing with the defendant's failure to object when this actual testimony was brought out. You claim that the objection was preserved because of the remarks and rulings at the sidebar. Is that correct? The motion limine the sidebar the post trial motion to continue about it this. There were justice the iron points out there was no objection made after the sidebar to the specific question ask of color. Is that right? To the one that I'm page 461 the one about fingertips. Yes, your honor. And you're claiming that there was no need because the objection of the defense was preserved by the discussion at the sidebar. Is that correct? The entire discussion of letting him have specialized knowledge and experience and use that as his weight to testify. Yes, the discussion at the sidebar was about strangulation. Wasn't it? Bruising by fingertips around the neck goes to the concept of constricting the airway. That's strangulation, your honor. In other words, Council, you know, let me explain. This is a panel of appellate judges. But back when we had honest work, we were all trial judges. And that's where our sympathy lies. And the point is. If the defendant doesn't want the jury to hear about. This particular testimony, which you claim is so damaging and improper. The way to do that is to object. And there was no objection made to this testimony. Now, it seems to me the best you can say is, well, the discussion about strangulation, the sidebar. Encompass this, but I find that to be not persuasive. Do you want to tell me why I should find that to be more persuasive than I do the discussion about strangulation? The sidebar is obviating the need to object when the sidebar is over and retook the stand. I'm going to lose my time in two seconds, but I fully go ahead. I'm not cutting you off. I want to know if it's important. Your honor, we've gone back and forth about our positions in this and your feelings on that. I'm pointing out real specifically here. I know. I know your honor. Why hasn't a forfeit occurred? What about the discussion concerning the strangulation? Obviated the need to object when Cowick was next asked in front of the jury, the question that you're objective because the global object now. Just Detective Cowick use his authority to say, I know better than you. And while that strangulation fingertips, that is something that is outside. Now, that's you may not rule in our favor. And that is your privilege for that. We were asking my question. Counsel, I'll give you one more chance. What is it about the discussion on strangulation at the sidebar, which obviated the need for the defendant to object to Cowick's testimony when the sidebar was over? And I've tried to answer your questions, your honor, that the discussion of his specialized knowledge was improper. Yes, he's a lay witness, but he was bringing in. I know better than you. That's what expert and specialized knowledge is. That was improper. And that's what we've asked as an alternative. So, thank you. Time is up. We'll take this. So, if someone wants to preserve an objection at a sidebar, what has been done in the years that I was on the trial bench is that they don't want to object every single time a question is asked related to that issue in front of the jury, then put on the record, then the defense counsel puts on the record, judge, please show my continuing objection each time this is brought up. That's the way to preserve, not to say, not to not object and say there was no need to object or to argue. Now, there's no need to object. I agree. That's by far the best practice. I agree with you. I don't disagree with you at all. But we're advocating here for dealing and for that reason, for all the relief we've asked before, we asked you to grant in his favor. Thank you, your honors. Thank you, counsel. We'll take this matter under advisement and issue a decision in due course and we'll stand in recess at this time. Thank you.